**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>CORNELL HICKS,<br><br>        Defendant. | Case No.: 1:24-cv-00055 JLT SKO<br><br>ORDER DENYING MOTION TO SUPPRESS<br>(Doc. 688) |

      Cornell Hicks moves the Court to suppress all evidence seized during car stops on October 21, 2023, and December 23, 2023. He argues that the stops were unreasonably prolonged and/or the searches were not supported by probable cause. Because the Court finds that the officers lawfully searched and seized the vehicle, the motion is **DENIED**.

**I.    Background**

      In July 2023, federal law enforcement began investigating drug trafficking activities of a group of people. (Doc. 1 at 14) The investigation including several wiretaps on the phones of identified conspirators, including Cory Donaldson, who, the evidence indicated, bought and re-sold large quantities of narcotics. *Id*. Agents had recorded conversations in which Donaldson purchased pound quantities of methamphetamine and firearms from another co-conspirator. *Id*. at 19-23, 24-25, 24-28, 28-31. Agents had also seized pound quantities of methamphetamine that Donaldson purchased from co-conspirators and provided to a confidential source. *Id*. at 14-15, 19-23, 24-25, 28-31

1    In October 2023, Donaldson sent a text to Angelica Flores, the sister of Alfonso Ortiz—who
2  was believed to be a large-scale distributor of methamphetamine—seeking to purchase
3  methamphetamine. (Doc. 1 at 41-45) Donaldson's text read, "I. I really need to get some. But I have
4  my daughter. All. Day. Can I send my partner who is half my business to pick up. He knows the get
5  down and the spot he has been with me a few times. Just this one???" *Id*. at 41. The investigating
6  agents had determined that, "DONALDSON has been established as a methamphetamine customer
7  being supplied by ORTIZ, and FLORES is known to distribute methamphetamine on ORTIZ' behalf.
8  Based on this information, I believe that DONALDSON was informing FLORES that he needs to get
9  methamphetamine but wanted to send his 'partner' to conduct the methamphetamine transaction.
10  DONALDSON vouched for his partner's credibility to conduct the methamphetamine transaction
11  stating, 'he knows the get down' and 'he has been with me a few times.'" *Id*.
12    Donaldson then called Ortiz and stated, "So I got a little situation. So I need some like really
13  bad. I've been out but… I'm at a birthday party and I was wondering if I could send a runner? . . .
14  He's been with me a couple times." (Doc. 1 at 41-42.) Ortiz agreed and indicated his sister, Flores,
15  would handle the transaction. *Id*. at 42. Donaldson then arranged with Flores to complete the
16  transaction and indicated, "Hey, I just spoke to your, to your brother but uh, I'm out and I need
17  probably three but the thing is I don't, I can't get away right now. I was wondering if I could send a
18  runner a guy that has been there before with me that knows how to get down, my partner. Just this
19  once." *Id*. at 42. Flores told Donaldson to direct his runner to "the store where you park at," to which
20  Donaldson confirmed understanding and said, "Yeah he will know exactly where to go cause he was
21  with me before so…" *Id*.
22    Donaldson then contacted Hicks and asked, "how fast can you get here to get to fucking Tulare
23  and pick up for me? I already talked to her she said it's a go. Same spot, same everything." (Doc. 1 at
24  43) When Hicks asked for a reminder of the pick-up spot, Donaldson reminded him, and Hicks
25  replied, "… I remember, I remember, where we were last time." *Id*. Donaldson confirmed and then
26  added, "Yes, the very last time. Yes. She, just park in the same spot and I'll give you the money to get
27  that then uh bring it back to me then we are good." *Id*. Hicks confirmed and said, "Okay, let me, let me
28  uh grab a shirt on . . . then I'm gone." *Id.* During the interval before Hicks arrived, Flores changed the

1  meeting spot. *Id*. at 44. Donaldson continued speaking to Flores—telling her the type of car Hicks
2  would drive (an "old tan Camry")—and directing Hicks to the new pick-up location. *Id*. at 44-45; Doc.
3  714-2 at 2; Doc. 714-3 at 2. Officers saw Flores and Hicks arrive at the location. (Doc. 714-1 at 3-5) A
4  few minutes later, both left. *Id*. at 5. Donaldson and Hicks then spoke by phone during which they
5  agreed that Hicks would meet Donaldson "at the trailer." *Id*.

6  From the time Donaldson first spoke to Flores about buying the narcotics, agents monitored the
7  communications between all involved and maintained surveillance using patrol cars and an aircraft.
8  (Doc. 714-4) Before the transaction occurred, the investigatory team had determined that they would
9  stop Hick's car after he left the location of the exchange. (Doc. 714-4 at 1) An officer commented,
10 "We are setting up a marked unit to rip a stop when the car leaves. So we are wanting uc vehicles to
11 follow the vehicle until the stop can be done in kings county." *Id*.

12 Five minutes after the cars departed, Kings County Sheriff's Deputy Brewster stopped Hicks'
13 vehicle. (Doc. 714-1 at 5.) He did so at the request of Kings County Sheriff's Sergeant Gilson, who
14 explained to Brewster that the stop would be a "wall stop." (Doc. 714-5 at 2) A wall stop is a pretext
15 traffic stop that is directed at the vehicle driven by an alleged coconspirator and done in a way as to
16 preserve the confidentiality of the larger investigation. *Id*.

17 Deputy Brewster, while stopped in his patrol car, saw Hicks' vehicle traveling "at a high rate
18 of speed." (Doc. 688-1 at 7) Brewster estimated the speed to be 85 in a 65 mile per hour zone. *Id.*
19 Brewster paced the vehicle, and saw it was passing other cars, which appeared to be travelling the
20 speed limit. *Id*. Brewster noted that his speedometer and his Garmin GPS revealed that Hicks' car was
21 traveling 86 miles per hour. *Id*. Brewster stopped the car using his overhead emergency lights. *Id*. Hick
22 yielded. *Id*. Brewster obtained Hicks' license and the name and date of birth of the passenger. *Id*. At
23 this time, CHP Officer Weir arrived. *Id*. Brewster asked for a records check on Hicks and the
24 passenger and learned there were no warrants, though Hicks "was known locally" for having
25 committed domestic violence and "for other arrests." *Id.* Due to Hicks' driving patterns, Brewster
26 asked Weir to conduct sobriety testing on Hicks. *Id*.

27 Around this time, K9 officer Rapozo arrived. (Doc. 688-1 at 1) Brewster asked Rapozo to walk
28 the K9, Miko, around the car. *Id*. By this time, both Hicks and the passenger were out of the car and in

3

1 exiting the car, the passenger left open the passenger door. *Id*. Rapozo commanded Miko to do an
2 "open air" sniff. *Id.* Upon receiving the command to search, Miko went immediately to the open
3 passenger door. *Id*. He jumped into the passenger seat, sniffed, and gave the alert signal. *Id*. Rapozo
4 commanded the dog to continue his search, but Miko found nothing of interest and returned to the
5 passenger area and jumped back onto the seat. *Id*.

6 Based upon Miko's conduct, Rapozo told Hicks that he was going to search the car and asked
7 whether there was anything inside the vehicle that could hurt the officer. (Doc. 688-1 at 11) Hicks said
8 there was not and said he had just gotten the car and that it belonged to his mother. *Id*. Rapozo search
9 the area where Miko first alerted and found a "gray and green plastic grocery bag from Walmart." *Id.*
10 Inside, he found "two ziploc bags of a white crystalline substance." *Id*. From his training and
11 experience, Rapozo believed it was methamphetamine. *Id*. Screening determined that the substance
12 was presumptively methamphetamine, and, in total, the two bags weighed just under two pounds.
13 (Doc. 688-1 at 10)

14 Once Rapozo located the methamphetamine, Officer Hernandez placed Hick under arrest.
15 (Doc. 688-1 at 9) While doing so, Hicks volunteered that he had narcotics in his pocket. *Id*. Hernandez
16 found what appeared to be methamphetamine in Hicks' right jacket pocket and "nine white oblong
17 pills in a clear zip-lock bag that had green plants imprinted on the bag." *Id*. Screening also determined
18 that the substance was presumptively methamphetamine, which weighed 1.20 ounces. (Doc. 688-1 at
19 10)

20 About two months later, on December 23, 2023, Hicks contacted Francisco Garcia. (Doc. 1 at
21 83-87) Garcia was identified in the investigation as a source of supply of methamphetamine. *Id*. at 84.
22 During this call, Hicks sought to purchase three pounds of methamphetamine for $2,800 or $2,900. *Id*.
23 Hicks said, "I, well, I got uh twenty-eight (28). I was tryin' to get three (3), I don't know . . .if I can
24 probably get it for that or twenty-nine (29) something like that." (Doc. 1 at Garcia confirmed that
25 Hicks wanted "three" and that Hicks "only ha[d] twenty-right (28) right now you said?", which Hicks
26 confirmed. *Id*. Garcia said that he had been selling "'em for three" but that, "they kinda already put a
27 stop to it . . . Because of Christmas and everything, but uh…" *Id*. Garcia reported that "I got 'em
28 though. Shit, I got them right here though." (Doc. 714-6 at 2) Hicks indicated that he needed to count

1  his cash and, if necessary, collect money, apparently, from people who owed him. *Id*. Hicks then
2  reported that he had the "three" (*Id*. at 4) and the pair agreed they would meet at the Caldwell exit of
3  Highway 99. (*Id*. at 4-5); Doc. 1 at 84-85.)

4      As in the earlier stop, the team determined that it would stop Hicks' car after the exchange.
5  (Doc. 714-7 at 1) The team established surveillance at the location where Hicks and Garcia agreed that
6  the exchange would occur and at Garcia's residence. (Doc. 1 at 85) This surveillance revealed Garcia
7  and another man, departing the residence and begin travelling to the meeting spot. *Id*. While driving
8  there, Garcia texted Hicks to find out when Hicks would arrive. *Id*. Hicks responded that he was
9  "Here." *Id*. Garcia then called Hicks and said, that he was right "Behind you." *Id*. at 86. An officer
10 saw Garcia's car stop behind Hicks' Camry. (*Id*.; Doc. 714-7 at 1.) Hicks then walked to Garcia's car
11 while carrying a bag. *Id*. Hicks then left Garcia's car and walked back to his own and left. *Id*.

12     Once Garcia's car left and Hick's began driving away, the officer reported, "Good for the
13 stop." (Doc. 714-7 at 1) The officer who would perform the stop, Tulare County Sheriff's Deputy
14 Birkner, reported that he had "eyes on." *Id*. Before the stop occurred, Kern County Sheriff's Office
15 Lieutenant Jones was told of the investigation and was requested to have an officer perform a "wall
16 stop." (Doc. 714-8 at 2) Lt. Jones was told that Hicks was intending to purchase three pounds of
17 methamphetamine at the location on near Caldwell Avenue and Highway 99 and was given details
18 about Hicks' car and a photo of the car. *Id.* Throughout the events leading up to the wall stop, the
19 investigatory team kept Lt. Jones apprised of what was happening. *Id.*  Jones relayed the information
20 to Deputy Birkner who had agreed to perform the stop. *Id*. Birkner reported the stop occurred at
21 "Akers and Caldwell" and, a few minutes later, that the citation would be for "open container of
22 alcohol or cannabis in a vehicle." (Doc. 714-7 at 1)

23     In his report, Birkner documented that he stopped Hicks' vehicle and obtained Hick's license.
24 (Doc. 688-2 at 5) While speaking to Hicks, Birkner smelled an odor of marijuana coming from inside
25 the car. *Id*. He observed Hicks to display signs consistent with being under the influence. *Id*. After
26 learning that Hicks' license was valid, Birkner returned to the car and asked Hicks whether he had any
27 narcotics. *Id.* Hicks pulled out a large bag of marijuana from his coat pocket. *Id*. Birkner told Hicks
28 that having the marijuana in his pocket constituted having an "open container." *Id*. Birkner took the

marijuana and secured it in his patrol car and then told Hicks that he was going to do a visual sweep for any other open containers. *Id*. Finding none, he gave the marijuana back to Hicks but told him he must store it in his trunk. *Id*. Hicks refused to open the trunk and, instead, threw the marijuana away in a nearby trash can. *Id*. Hicks told Birkner that he had last used earlier in the day. *Id*. Bikner then required Hicks to submit to sobriety testing. *Id*. at 5-6. After conducting the testing, Birkner formed the opinion that Hicks was under the influence of a controlled substance and placed him under arrest. *Id.* at 6. Birkner determined that the car needed to be towed, and he and another officer, Garcia, conducted an inventory search. *Id*. Garcia found a loaded 9 mm handgun in the trunk of the car. *Id*. The handgun had been reported stolen. (Doc. 1 at 86)

Garcia also found a bag behind the driver's seat with suspected methamphetamine and a meth pipe with residue in it. (Doc. 688-2 at 7) A lab later confirmed the suspected methamphetamine was, indeed, methamphetamine and that it weighed 185.1 grams. (Doc. 1 at 86-87) Garcia also found a locked briefcase. *Id*. After obtaining a search warrant, the briefcase was opened, it held about three pounds of methamphetamine. (Doc. 1 at 86-87)

## II.     Legal Authorities

"The Fourth Amendment permits investigatory stops [of a vehicle] if the facts known to the officers established 'reasonable suspicion to believe that criminal activity may be afoot.'" *United States v. Magallon-Lopez*, 817 F.3d 671, 674 (9th Cir. 2016) (quoting *United States v. Arvizu*, 435 U.S. 266, 273 (2002)). And officers may conduct a warrantless search of a vehicle if they have probable cause—when "acts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found." *United States v. Ibarra*, 345 F.3d 711, 716 (9th Cir. 2003).

The government argues that there was probable cause to stop Hicks' vehicle on both occasions based upon the collective knowledge of the investigatory team who enlisted the patrol officers to effectuate the stops. The collective knowledge doctrine applies "where an officer (or team of officers), with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007). The

collective probable cause of the other officers transfers to the arresting or searching officer who "rel[ies] on an instruction to arrest delivered by other officers possessing probable cause." *Id*. at 1036.

When a court applies the "collective knowledge" doctrine to a search occurring during a traffic stop, the question is no longer whether there was a violation of traffic laws but, instead, whether there was probable cause for the search. *Ramirez*, at 1030-1031. In *Ramirez* at 1028-1030, officers stopped a vehicle that had been found to have drugs secreted in it a few weeks before. Before stopping the car, they followed it to a location where the occupants met with others and appeared to exchange an envelope for a duffle bag. *Id*. It appeared that the duffle bag was placed in the rear of the vehicle where the hidden compartment had previously been discovered. *Id*. When the officer reported this information, the sergeant issued a request to have a uniformed officer conduct a traffic stop on the car. *Id*. Though he did not know the specifics of the need for the stop, the patrol officer knew that the sergeant was the head of vice/narcotics and believed the traffic stop related to an ongoing narcotics investigation.  *Id*.

The officer observed the car staddle the traffic lanes and stopped the car for this reason. *Ramirez,* at 1029. After stopping the car, the police officer cited the driver for this and for driving without a California license, though he had produced a Mexican driver's license. *Id*. An hour after the stop began, the K9 officer walked her dog around the vehicle. *Id.* at 1030. The dog alerted on the rear interior of the car where the officers found eight kilos of cocaine. *Id*.

After the two people who had been in the car were indicted, they moved to suppress the evidence of the cocaine. *Ramirez*, at 1030. The two argued that the stop was improper because the officer making the stop did not know the facts that gave rise to probable cause and because the traffic stop itself was unlawful because straddling a lane was not illegal. *Id*. The trial judge rejected both arguments and concluded that because there was probable cause to search the vehicle, the traffic stop was valid, and the search was proper. *Id*.

On appeal, the defendants asserted again that the stop was improper because straddling lanes while driving is not illegal unless another car is endangered thereby and because the Mexican driver's license provided lawful permission to drive in California. *Ramirez*, at 1030. Thus, they argued that the trial court erred when it failed to suppress the drugs found in the car. *Id*. The Ninth Circuit disagreed.

7

The Court surveyed the caselaw in this area and determined that what was known to the officers collectively is sufficient to establish probable cause for the traffic stop. *Id*. at 1030-1037. Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment. *Id*. at 1037. The concurrence noted,

> This is not a case where the investigating officers ordered a fellow officer to conduct a traffic stop because they lacked probable cause for a narcotics stop. Sergeant Meier had probable cause to order a narcotics stop, and that's exactly what he did. He requested that the arresting officer make it look like a "traffic stop" as a safety measure, to prevent the risk of harm to a lone officer trying to make a narcotics arrest before backups could arrive on the scene. But that did not change the nature of the stop, which remained—in substance—a narcotics stop.

*Id*. at 1037.

## II.     Analysis

The information detailed above demonstrates that in advance of the October stop, law enforcement was aware that Donaldson had bought and sold pound quantities of methamphetamine. They then intercepted communications between him, Ortiz and Flores in which, arguably, he was seeking to buy two pounds of methamphetamine and to have it picked up by his partner, Hicks. Hicks agreed to go pick up the drugs, albeit the words "drugs" or "narcotics" was not used between the two, and admitted to having been present during earlier such transactions between Donaldson and Flores. Officers observed Hicks' vehicle and Flores' vehicle arrive at the same location and then depart. Hicks communicated to Donaldson when the exchange was over, and they coordinated as to where to meet so that Hicks could give Donaldson what he received from Flores. This information is sufficient to establish probable cause that criminal activity was afoot, and that Hicks had committed the crime. Though there could have been a non-criminal reason for all of this conduct, the officers were not obligated to ascribe innocent explanations to it.

When Brewster stopped the car in October 2023, he was apprised of the nature of the investigation and was asked to make a "wall stop." (Doc. 714-5 at 2) Thus, under the collective knowledge doctrine and under the probable cause that was detailed to Brewster before he made the traffic stop and because there is no doubt that because Hicks was speeding at the time of this traffic

8

stop, there was probable cause for Brewster to make the stop. Even still, based upon the facts set forth above, the Court rejects that the officer had to have a legal basis to stop the car independent from the narcotics conduct. *Ramirez*, at 1030-1031.

Also, before the vehicle stop in December 2023, the investigatory team intercepted what was arguably a negotiation between Hicks and Garica in which Hicks sought to buy three pounds of methamphetamine and Garcia agreed to sell it. Once the officers observed the two meet at the agreed upon location, they, collectively, had knowledge sufficient to support probable cause to stop and search Hicks' car. Before the officer stopped the car, his superiors were given information about the investigation and what the officers had observed, a description of the car that Hicks was driving and a photo of it. (Doc. 714-8 at 2-3) Based upon this information and that set forth above, the Court finds that there was probable cause to stop and search Hicks' vehicle in December 2023. The fact that the declaration of Lt. Jones is ambiguous as to whether the traffic officer knew the specifics does not change the analysis. *Ramirez*, at 1037.

By this time, the officers also knew that Hicks had possessed about two pounds of methamphetamine as a result of the exchange he made with Flores at the request of Donaldson in October 2023. Even had they not known this information, the facts related to the December 2023 event alone constituted probable cause for the stop and search. Just as in the October 2023 stop, the Court rejects that the officer needed a purpose independent of the narcotics investigation to make the stop and search the vehicle.

Even still, Hicks continues to take the position that the stop of the vehicle occurred only upon reasonable suspicion based upon the apparent continued investigation at the scene. He argues further that because the information gathered at the scene of the stop did not ripen into probable cause, the searches of the vehicle in October and December were improper. The Court disagrees. Law enforcement officers stopped the vehicle on both occasions related to the narcotics investigation based upon probable cause. The fact that they took efforts to make the ruse more believable does not undercut the Court's determination that there was probable cause to support the searches occurring on both dates.

///

9

# CONCLUSION

For the reasons set forth here, the motion to suppress[1] is **DENIED**.

IT IS SO ORDERED.

Dated:  **September 30, 2025**

_____
UNITED STATES DISTRICT JUDGE

---

[1] At the hearing, defense counsel sought an evidentiary hearing to determine what the officers who made the traffic stops knew. However, there was no showing that an evidentiary would bear on the issues for the Court, given that the collective knowledge doctrine does not look to what was in the mind of a particular officer in the context of a wall stop. Thus, the Court finds no evidentiary hearing is warranted. See United States v. Howell, 231 F.3d 615, 620 (9th Cir. 2000) ("An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist.") (citing United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986), United States v. Harris, 914 F.2d 927, 933 (7th Cir. 1990), United States v. Irwin, 612 F.2d 1182, 1187 n.14 (9th Cir. 1980) and United States v. Carrion, 463 F.2d 704, 706 (9th Cir. 1972)); United States v. Marcello, 731 F.2d 1354, 1358 (9th Cir. 1984) ("[T]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a desire to cross-examine."); United States v. Woodson, No. CR 11-00531 WHA, 2011 WL 5884913, at *6 (N.D. Cal. Nov. 23, 2011) (denying a defense request for an evidentiary hearing because "mere refusal to accept the uncontradicted evidence does not create a material issue of fact"); United States v. Walker, 239 F. Supp. 3d 738, 739 (S.D.N.Y. 2017) ("While [an evidentiary hearing] might have been warranted if there were important credibility issues that could not be addressed from the paper record, the defendant has made no showing that that is the case here."); United States v. Martinez, 992 F. Supp. 2d 322, 325–26 (S.D.N.Y. 2014) ("A defendant is not entitled to an evidentiary hearing in connection with a motion to suppress unless he can show that there are 'contested issues of fact going to the validity of the search' " and in the absence of an affidavit "by someone with personal knowledge that disputed facts exist" an evidentiary hearing is unnecessary) (citations omitted).